JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Robert Hill, Gregory Hall and One Particular Harbor, LLC

**DEFENDANTS**
Zambrio & Associates, LLC and Louis Zambrio

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brendan G. Lamanna, Esquire
1818 Market St., 13th Floor
Philadelphia, PA 19103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____
Brief description of cause:
Legal Malpractice

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  1/24/19

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ROBERT HILL, GREGORY HALL** And **ONE PARTICULAR HARBOR, LLC,**<br><br>Plaintiffs,<br><br>vs.<br><br>**ZAMBRIO & ASSOCIATES, LLC** And **LOUIS ZAMBRIO,**<br><br>Defendants. | Civil Action No.:_____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Robert Hill, Gregory Hall and One Particular Harbor, LLC (collectively, "Plaintiffs"), file this Complaint against Defendants, Zambrio & Associates, LLC and Louis Zambrio, (collectively, "Defendants"), and aver as follows:

## INTRODUCTION

1.      This is a legal malpractice claim grounded in both breach of contract and negligence arising from an attorney's failure to document a business transaction in accordance with his clients' express written instructions, and for failing to advise his clients that the documents they were presented to sign did not correspond to their intention and understanding, all of which resulted in substantial losses exceeding One Million Dollars ($1,000,000).

1

## PARTIES

2.     Plaintiff, Robert Hill ("Hill"), is an adult individual and resident of the Commonwealth of Pennsylvania with an address of 1841 Bayou Grande Blvd NE, St. Petersburg, Florida 33703.

3.     Plaintiff, Gregory Hall ("Hall"), is an adult individual and resident of the State of South Carolina with an address of 217 Governor Glen Drive, Sunset, SC 29685.

4.     Plaintiff, One Particular Harbor, LLC ("OPH"), is a limited liability company formed and existing under the laws of the State of Delaware with a place of business located at 1841 Bayou Grande Blvd. NE, St. Petersburg, Florida, 33703.

5.     Defendant, Louis Zambrio ("Zambrio"), is an attorney licensed to practice law in the State of New Jersey and, upon information and belief, is the sole member of Defendant, Zambrio & Associates, LLC ("Z&A"), with a business address of 39 Waldon Road, Fanwood, NJ 07023.

6.     Defendant, Z&A, is a law firm and limited liability company organized and existing under the laws of the State of New Jersey, with a principal place of business located at 39 Waldon Road, Fanwood, NJ 07023.

7.     At all times material, Zambrio acted on his own behalf and by, through and on behalf of Z&A.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because Plaintiffs, Hill, Hall and OPH, are citizens of Pennsylvania, South Carolina and Delaware, respectively, and Defendants are citizens of the State of New Jersey and the matter in controversy exceeds $75,000, exclusive of interest and cost.

2

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1319(b) because this is the judicial district in which Defendants reside and a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

### FACTUAL BACKGROUND

10.     In August 2014, Hill and Hall invested in a company known as WageSecure, LLC ("WageSecure").

11.     In exchange for providing a line of credit of $1,500,000, Hill and Hall each received a 7.5% membership interest in WageSecure.

12.     Contemporaneous with their initial investment by way of the line of credit, Hall purchased an additional 2.5% interest from the then majority member of WageSecure, Venture Quest Capital Partners, LLC a/k/a Venture Quest Partners, LLC ("VQ"), which was owned and controlled by Aaron Blackman ("Blackman").

13.     In late 2015, Hill and Hall exercised options to each acquire another 7.5% in exchange for a collective investment of $1,000,000, or $500,000 apiece.

14.     By June 2016, the relationship between Hill and Hall, on the one hand, and Blackman, on the other, soured significantly, and the parties thereafter began to negotiate the terms by which Hill and Hall would each sell to VQ a significant portion of their respective interests in WageSecure.

15.     VQ was represented by counsel, who prepared drafts of related agreements outlining the terms of the sale.

16.     Hill and Hall in turn hired Zambrio and Z&A to review the drafts and to insure that they corresponded to their intent and understanding.

3

17.     On or about June 30, 2016, Blackman, through VQ, entered into an agreement with Hill and Hall, pursuant to which the parties agreed, *inter alia*, that VQ would purchase from each of Hill and Hall 10% of their interests in WageSecure ("June 2016 Agreement").

18.     In connection with the June 2016 Agreement, VQ issued to each of Hill and Hall a promissory note to secure its repurchase obligation (the "Hill/Hall Notes"), which required monthly payments by VQ commencing in September 2016 and continuing until the purchase price had been paid in full.

19.     VQ failed to make the first payment required under the Hill/Hall Notes in September 2016.

20.     Following VQ's default, and in order to protect and hopefully preserve their substantial prior investments in WageSecure, Hill and Hall began discussions with Blackman whereby Blackman (through VQ) would relinquish to Hill and Hall all but a small percentage of his equity interest in WageSecure.

21.     On September 26, 2016, Hill emailed Zambrio setting forth the salient terms of the agreement Hill and Hall intended to reach with Blackman. After outlining the financial terms, Hill noted "[i]f we stop payment or fail to pay the remaining we keep the % we paid for less 10% as a penalty for not completing the contract." Hill went on to provide an example and at the conclusion of the email wrote "[w]e want to be able to walk away at any time." A true and correct copy of the September 26, 2016 email is attached as Exhibit "1."

22.     An agreement ultimately was reached in October 2016, pursuant to which Hill (through OPH) and Hall, collectively, would pay to VQ $15,000 per month plus accrued interest, beginning on November 1, 2016.

23.     For each $50,000 paid toward the $1,000,000 total purchase price, Hill (through OPH) and Hall each were to acquire additional interests in WageSecure.

24.     In the event Hill (through OPH) and Hall decided to acquire the maximum interests, a balloon payment of $850,000, plus interest, was due on September 1, 2017.

25.     Upon payment of the full purchase price, the parties agreed that VQ's interest in WageSecure would be reduced to fifteen percent (15%).

26.     Hill (through OPH) and Hall hired Zambrio and Z&A to prepare written instruments documenting the proposed transaction.

27.     Hill (through OPH) and Hall understood and intended, and so communicated to Zambrio and Z&A, that they could at any time stop their monthly payments to VQ and forego the acquisition of further membership interests, in which case Hill (through OPH) and Hall would retain the membership interests already acquired, less a ten percent (10%) penalty ("10% Penalty"), and VQ would retain the rest.

28.     On October 5, 2016 at approximately 8:32a.m., Zambrio circulated by email a draft Membership Interest Purchase Agreement ("MIPA"), Secured Promissory Notes ("Notes") and Pledge Agreements ("Pledges") to Hill and Hall.  A true and correct copy of the October 5, 2016 email thread is attached as Exhibit "2."

29.     Approximately one hour later, at 9:20a.m., Hill emailed Zambrio, stating, in relevant part: "[a]s long as we can exit with just a proportional part of the shares (less 10% penalty) this works."  *See* Ex. "2."

30.     Approximately one hour later, at 10:40a.m., Zambrio wrote to Hill and Hall, in relevant part, as follows:

> The documents read that you keep the interests you pay for ("Acquired Interests") less the 10% penalty, however failure to pay will be a default

where he can take the remaining interests back and do what he wants with them. His attorney will probably not allow it to go any other way.  Let me know you get that from the Pledge Agreement and Purchase Agreement.

*See* Ex. "2."

31.    Hill responded at 11:22 as follows:

What we want to have happen is:

1M payment for 60%
If we only pay 100k we get 6% less 10% for the default or 5.4.% net
He gets 54.6.% back
Nothing in regards to the shares we already own.

*See* Ex. "2."

32.    Hall weighed-in a few minutes later, stating "[p]lease do it."  *See* Ex. "2."

33.    Later that afternoon, Zambrio circulated to Hill and Hall a revised MIPA, Pledge Agreement and Promissory Note, which Hall thereafter emailed to Blackman and his counsel. *See* Ex. "2."

34.    Hill and Hall executed and returned to Zambrio the MIPAs, Notes and Pledges (collectively, the "October 2016 Documents") on or about October 7, 2016.[1]  True and correct copies of the October 2016 Documents are collectively attached as Exhibit "3."

35.    As Hill and Hall later came to learn, the October 2016 Documents contained multiple errors and omissions, including but not limited to the following:

- The documents incorrectly stated the respective interests of the members as of the time of the October transaction;

---

[1] VQ, Hill, Hall and Blackman also entered into a Loan Termination Agreement pursuant to which the Hill/Hall Notes were cancelled.

- The Recitals in the MIPAs suggested that Hill (through OPH) and Hall were acquiring 28.5% each, while Section 1.1 indicated that they were acquiring 30% each;

- The Notes suggested that installment payments would begin on October 15, 2017 and continue for the next twenty months, yet the maturity date and balloon payment due date under the Notes was only eleven months out (September 15, 2017).

*See* Ex. "2."

36.     Most significantly, the October 2016 Documents did not allow Hill (through OPH) and Hall to stop making payment at any time, subject only to the 10% Penalty.

37.     From November 1, 2016 through April 1, 2017, Hill (through OPH) and Hall collectively paid to VQ a total $90,000 (i.e. $15,000/month x six months).

38.     In April 2017, Hill and Hall learned that Blackman was engaged in an array of misconduct detrimental to WageSecure and its members.

39.     Hill and Hall instructed Blackman to refrain from continued misconduct but Blackman refused.

40.     As Blackman's refusal to cease his misconduct directly affected Hill's and Hall's membership interests in WageSecure, and in particular the additional membership interests they were acquiring pursuant to the October 2016 Documents, Hill (through OPH) and Hall, believing that they were entitled to do so, ceased making payments on their Notes.

41.     Hill and Hall further advised Blackman and VQ that they (Hill and Hall) would take appropriate legal action to protect their and WageSecure's interests and secure compensation for all resulting losses.

42.    Blackman and VQ took the offensive and declared the October 2016 Notes and Pledges in default and demanded that Hill and Hall each repay the full balance of their respective Notes.

43.    After conferring with counsel, Hill and Hall for the first time learned that the October 2016 Documents conferred upon VQ not only the reversionary right to receive the unacquired interests plus the 10% Penalty in the event of non-payment, but to hold Hill (through OPH) and Hall liable for the unpaid balance of their Notes as well. *See* Ex. "2," *compare* Section 1 of the MIPAs with Section 5 of the Notes.

44.    In other words, Hill and Hall learned that the October 2016 Documents did not provide for, as Hill and Hall expressly instructed Zambrio, the right to stop payment at any time, subject only to the 10% Penalty.

45.    After several months of hotly contested litigation in both New York and Pennsylvania, in which Hill (through OPH) and Hall sought to have the MIPA, Notes and Pledges reformed or, in the alternative, declared null and void, Hill and Hall settled their disputes with Blackman.

46.    Pursuant to the terms of the settlement agreement with Blackman, Hill and Hall agreed to pay Blackman $850,000 and Blackman (through VQ) would retain a 22.5% interest in WageSecure.

47.    Hill, Hall and Blackman further agreed to work together to sell WageSecure and, upon its sale, Blackman was to receive the first $350,000 of the sale proceeds which Hill and Hall would otherwise be entitled to, with the remaining sale proceeds to be distributed on a pro-rata basis based upon respective membership interests.

48.     Hill, Hall and Blackman have since entered into additional agreements, which have served to, *inter alia*, adjust the amounts payable to Blackman (through VQ) at and following the sale of WageSecure.

49.     As a result of Defendants' unlawful conduct described herein, Plaintiffs were damaged by, including but not limited to, the following: 1) having to purchase greater interests in WageSecure than they otherwise would have and having to do so for a  price far in excess of the value of the interests; 2) having to retain and pay counsel to litigate the disputes with Blackman; 3) having to pay Blackman to settle the disputes; and 4) payments to Defendants for legal work that was substandard and not in accordance with the specific instructions given by Plaintiffs.

## COUNT I - Breach of Contract

50.     Plaintiffs repeat and re-allege every allegation set forth in the preceding paragraphs as if set forth at length herein.

51.     Defendants agreed to, and did in fact, represent Plaintiffs in connection with the transactions described herein.

52.     Pursuant to the agreement, Defendants agreed to, among other things, diligently and competently represent Plaintiffs.

53.     Plaintiffs paid Defendants for their services.

54.     Defendants' breached the terms of their agreement with Plaintiffs by failing to draft the October 2016 Documents such that Plaintiffs would have the right to stop making payment at any time, subject only to the 10% Penalty, as specifically and expressly instructed by Hill and Hall.

55.     Defendants further breached their agreement with Plaintiffs by failing to advise Hill and Hall that the October 2016 Documents did not allow for Plaintiffs to stop making payment at any time, as Hill and Hall expressly requested.

56.     As a direct and proximate result of Defendants' breaches, Plaintiffs have and will

continue to sustain damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants:

(a)        For the return of all payments made by Plaintiffs to Defendants;

(b)        For damages suffered by Plaintiffs, including punitive damages;

(c)        For interest, attorneys' fees and costs of suit; and

(d)        For such other relief the Court deems just and proper.

## COUNT II – LEGAL MALPRACTICE

57.     Plaintiffs repeat and re-allege every allegation set forth in the preceding paragraphs as if set forth at length herein.

58.     Zambrio is an attorney admitted to practice law in the State of New Jersey.

59.     Plaintiffs retained Defendants to perform certain legal services and to represent their interests with regard to the transactions described herein.

60.     At all times, Zambrio held himself out as competent in the relevant areas of law and capable of representing Plaintiffs in the transactions described herein.

61.     Plaintiffs reasonably relied upon Zambrio's representation that he was skilled and experienced in the relevant areas of law.

62.     Zambrio was required to exercise the same care as a reasonably competent attorney licensed to practice in the State of New Jersey.

63.     Zambrio failed to perform his duties and otherwise act in a manner consistent with that of competent attorneys in New Jersey who possess and exercise legal knowledge, skill and ability.

64.     Among other things, Hill and Hall expressly instructed Zambrio to draft the October 2016 Documents such that Hill (through OPH) and Hall would have the right to stop making payments at any time, subject only to the 10% Penalty.

65.     Zambrio, however, failed to draft the October 2016 Documents in accordance with the express instructions of Hill and Hall.

66.     Zambrio further failed to advise Hill and Hall that the October 2016 Documents did not allow Hill (through OPH) and Hall to stop making payments at any time.

67.     The October 2016 Documents also failed to properly account for the parties' respective ownership interests as of the time the documents were entered into.

68.     As a direct and proximate cause of Defendants' negligence, Plaintiffs have been and continue to suffer damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants:

     (e)        For the return of all payments made by Plaintiffs to Defendants;

     (f)        For damages suffered by Plaintiffs, including punitive damages;

     (g)        For interest, attorneys' fees and costs of suit; and

     (h)        For such other relief the Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY

69.     Plaintiffs repeat and re-allege every allegation set forth in the preceding paragraphs as if set forth at length herein.

70.     A relationship of trust and confidence existed between Plaintiffs and Defendants by virtue of their attorney-client relationship.

71.     Defendants owed Plaintiffs fiduciary duties of good faith, fidelity and undivided loyalty.

11

72. Defendants knew that Plaintiffs were relying on them and that Plaintiffs were in a position of inequality and depended upon Defendants to treat them fairly.

73. As a result of the conduct alleged herein, Defendants breached their fiduciary duties to Plaintiffs.

74. The conduct of Defendants was wrongful, without justification or excuse and contrary to generally accepted standards of morality.

75. In addition, the acts and omissions of Defendants were committed with actual malice and/or wanton and willful disregard of Plaintiffs' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

76. As a direct and proximate cause of Defendants' breaches of their fiduciary duties, Plaintiffs have and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants:

(a) For the return of all payments made by Plaintiffs to Defendants;

(b) For damages suffered by Plaintiffs, including punitive damages;

(c) For interest, attorneys' fees and costs of suit; and

(d) For such other relief the Court deems just and proper.

ZARWIN ◆ BAUM ◆ DEVITO
KAPLAN ◆ SCHAER ◆ TODDY ◆ P.C.
*Attorneys for Plaintiffs*

BRENDAN G. LAMANNA, ESQ.
bglamanna@zarwin.com
1818 Market Street, 13th Floor
Philadelphia, PA 19103
Ph: (215) 569-2800
Fax: (215) 569-1606
Attorney for Plaintiffs

Date: 12/4/17

## DESIGNATION OF TRIAL COUNSEL

Brendan G. Lamanna, Esquire is designated as trial counsel for this matter.

ZARWIN ◆ BAUM ◆ DEVITO
KAPLAN ◆ SCHAER ◆ TODDY ◆ P.C.
*Attorneys for Plaintiffs*

BRENDAN G. LAMANNA, ESQ.
bglamanna@zarwin.com
1818 Market Street, 13th Floor
Philadelphia, PA 19103
Ph: (215) 569-2800
Fax: (215) 569-1606
Attorney for Plaintiffs

Date: 1/24/17

## DEMAND FOR TRIAL BY JURY

Plaintiffs respectfully request a trial by jury on all issues in the within action.

ZARWIN ◆ BAUM ◆ DEVITO
KAPLAN ◆ SCHAER ◆ TODDY ◆ P.C.
*Attorneys for Plaintiffs*

BRENDAN G. LAMANNA, ESQ.
bglamanna@zarwin.com
1818 Market Street, 13th Floor
Philadelphia, PA 19103
Ph: (215) 569-2800
Fax: (215) 569-1606
Attorney for Plaintiffs

Date: 1/24/17

13

**Exhibit "1"**

**Anthony Reynolds**

**From:** Louis Zambrio <louis@zambriolaw.com>
**Sent:** Wednesday, September 28, 2016 5:03 PM
**To:** Robert Hill - Blackmoor
**Cc:** Greg S. Hall
**Subject:** Re: Aaron - Details

Hi,

Which state is Aaron employed in and is his attorney the same guy we worked "with" recently that was so difficult?

Regards,
Louis


On Sep 26, 2016 2:22 PM, "Robert Hill - Blackmoor" <rhill@blackmooragency.com> wrote:

What we propose to Aaron is that we agree amend ownership to:

Greg Hall 42.5%

Bob Hill 40.0%

Aaron Blackman 12.5%

Board Members 5.0%

The agreement his ownership from the current position to 12.5% is being purchased for $1,000,000 ( approx. 60% of the company)

For every $100,000 we pay him we get approximately 6% of the company

We have a payment plan of $15,000 a month for 20 months.

After which time we pay a lump sum of $700,000.

If we stop payment or fail to pay the remaining we keep the % we paid for less 10% as a penalty for not completing the contract.

For example:

15 months are paid then stopped.

Total amount paid $225,000 225,000/100,000 x 5%= 11.25% less 10% penalty = 10.125%

2 provisions needed:

1. We are not responsible for anything he has done or liable for anything he has spent without prior approval from Hill and Hall

1

2. We want to be able to walk away at any time.

Robert B. Hill, CPCU

Partner - Chief Underwriting Officer

Blackmoor General Insurance Agency

747 Dresher Road, Suite 100

Horsham, PA 19044

267.495.2333 (office)

484.213.3949 (cell)

**From:** Louis Zambrio [mailto:louis@zambriolaw.com]
**Sent:** Saturday, September 24, 2016 1:11 PM
**To:** gschildhorn@eckertseamans.com; Greg S. Hall <greg.hall1@comcast.net>; Robert Hill <rhill@signatureconsultingsolutions.com>; Robert Hill - Blackmoor <rhill@blackmooragency.com>
**Subject:** Miles Exercise of Conversion

**Exhibit "2"**

**Brendan G. Lamanna**

| | |
|---|---|
| **From:** | Louis Zambrio <louis_zambrio@hotmail.com> |
| **Sent:** | Wednesday, August 16, 2017 4:07 PM |
| **To:** | Brendan G. Lamanna |
| **Subject:** | Fw: Aaron's Dcoumentation |

Another email.

**From:** Robert Hill - Blackmoor <rhill@blackmooragency.com>
**Sent:** Wednesday, October 5, 2016 3:38 PM
**To:** Louis Zambrio; Greg-
**Cc:** Robert Hill
**Subject:** RE: Aaron's Dcoumentation

Works for me...

Robert B. Hill,CPCU

Partner- Chief Underwriting Officer

Blackmoor General Insurance Agency

747 Dresher Road, Suite 100

Horsham, PA 19044

267.495.2333 (office)

484.213.3949 (cell)

**From:** Louis Zambrio [mailto:louis_zambrio@hotmail.com]
**Sent:** Wednesday, October 05, 2016 3:09 PM
**To:** Greg- <greg.hall1@comcast.net>; Robert Hill - Blackmoor <rhill@blackmooragency.com>
**Cc:** Robert Hill <rhill@signatureconsultingsolutions.com>
**Subject:** Re: Aaron's Dcoumentation

Attached are the revised documents.  Section 7 of the Membership Interest Purchase Agreement states that Blackman releases Buyer (Hill and Hall) from all liabilities incurred prior to the execution the agreement that were incurred as a member, consultant, employee or whatever.

1

Let me know if you have any questions.

Regards,
Louis

---

**From:** Greg- <greg.hall1@comcast.net>
**Sent:** Wednesday, October 5, 2016 11:26 AM
**To:** Robert Hill - Blackmoor
**Cc:** Louis Zambrio; Robert Hill
**Subject:** Re: Aaron's Dcoumentation

Ok please do it

Sent from my iPhone

On Oct 5, 2016, at 11:22 AM, Robert Hill - Blackmoor <rhill@blackmooragency.com> wrote

What we want to have happen is:

1M payment for 60%

If we only pay 100k we get 6% less 10% for the default or 5.4% net

He gets the 54.6% back

Nothing in regards to the shares we already own.

Robert B. Hill,CPCU

Partner- Chief Underwriting Officer

Blackmoor General Insurance Agency

747 Dresher Road, Suite 100

Horsham, PA 19044

2

267.495.2333 (office)

484.213.3949 (cell)

**From:** Louis Zambrio [mailto:louis_zambrio@hotmail.com]
**Sent:** Wednesday, October 05, 2016 10:40 AM
**To:** Greg S. Hall <greg.hall1@comcast.net>; Robert Hill - Blackmoor <rhill@blackmooragency.com>;
Robert Hill <rhill@signatureconsultingsolutions.com>
**Subject:** Re: Aaron's Dcoumentation


Hi,

The documents read that you keep the interests you pay for ("Acquired Interests") less the 10% penalty, however failure to pay will be a default where he can take the remaining interests back and do what he wants with them.  His attorney will probably not allow it to go any other way.  Let me know you get that from the Pledge Agreement and Purchase Agreement.

I will put together a letter for the default on payments.

Regards,
Louis


**From:** Greg S. Hall <greg.hall1@comcast.net>
**Sent:** Wednesday, October 5, 2016 9:31 AM
**To:** Robert Hill - Blackmoor; Louis Zambrio; Robert Hill
**Subject:** Re: Aaron's Dcoumentation


sure


Greg S. Hall

President

SCS

747 Dresher Road, Suite 100

Horsham, PA 19044

3

(c) 678-777-7138

Greg.hall1@comcast.net

**From:** Robert Hill - Blackmoor <rhill@blackmooragency.com>
**Date:** Wednesday, October 5, 2016 at 9:26 AM
**To:** Louis Zambrio <louis_zambrio@hotmail.com>, "Greg S. Hall" <greg.hall1@comcast.net>, Bob Hill <rhill@signatureconsultingsolutions.com>
**Subject:** RE: Aaron's Dcoumentation

As long as if we default we can exit with just a proportional part of the shares ( less 10% penalty) this works.

I would also like you to prepare a short letter telling Aaron that he is in DEFLALT of the last agreement and currently owes us September and October payments.

Advise him that the shares will revert back to us if no payment in made within10 business days.

Ok Greg?

Robert B. Hill,CPCU

Partner- Chief Underwriting Officer

Blackmoor General Insurance Agency

747 Dresher Road, Suite 100

Horsham, PA 19044

267.495.2333 (office)

484.213.3949 (cell)

**From:** Louis Zambrio [mailto:louis_zambrio@hotmail.com]
**Sent:** Wednesday, October 05, 2016 8:32 AM
**To:** Greg S. Hall <greg.hall1@comcast.net>; Robert Hill - Blackmoor <rhill@blackmooragency.com>;

4

Robert Hill <rhill@signatureconsultingsolutions.com>
**Subject:** Aaron's Dcoumentation

Hi Guys,

Attached is a Membership Interest Purchase Agreement, Promissory Note and Pledge Agreement with respect to the purchase of 30% of the membership interests in WageSecure for Bob. This is just the forms for Bob. The same set of documents will be duplicated for Greg once we finalize these documents. The one thing I need is an interest rate for the promissory note.

After you review, let me know if you have any questions or comments.

Regards,
Louis

**Exhibit "3"**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This **Membership Interest Purchase Agreement** (this "Agreement") is made as of the 1st day of October, 2016 by and between Greg Hall ("Buyer") and Venture Quest Partners, LLC ("Seller").

### RECITALS:

**WHEREAS**, Seller is the owner of 72.5% of the membership interests ("Interests") in WageSecure, LLC, a Delaware limited liability company (the "Company"); and

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, 28.5% of the Interests in the Company upon the terms and conditions provided herein.

**NOW, THEREFORE,** the parties hereto agree as follows:

1. <u>Purchase and Sale.</u>

    1.1     Pursuant to the terms and conditions of this Agreement, Seller hereby agrees to sell and transfer to Buyer and Buyer hereby agrees to purchase from Seller, thirty percent (30%) of the Interests in the Company. The new equity ownership for the Company is set forth on Exhibit C as the Amended and Restated Exhibit A to the Operating Agreement.

    1.2     The total purchase price for the Interests to be paid by the Buyer to the Seller shall be five hundred thousand dollars ($500,000) ($50,000 per 3% percent of the Interests) (the "Purchase Price"). For each 3% of the Company paid for by Buyer ("Acquired Interests"), such Acquired Interests will no longer subject to the Pledge Agreement (as defined below), except as otherwise set forth therein.

    1.3     The Purchase Price shall be paid by delivery of a promissory note (the "Note") from the Buyer in the form of Exhibit A attached hereto, in the total principal amount of the Purchase Price, payable in regular monthly payments of principal and interest, commencing on October 15, 2016 with a balloon payment of the amount then remaining payable on September 15, 2017, which will be secured by the Interests, other than the Acquired Interests, pursuant to a pledge agreement (the "Pledge Agreement"), in the form of which is attached hereto as Exhibit B.

2. <u>Seller's Representations.</u>  Seller represents and warrants to Buyer that:

    3.1     Subject to the terms and conditions of the Operating Agreement (as defined in Section 5 below), Seller owns good and marketable title to the Interests, free and clear of all security interests, pledges, liens and encumbrances. The Interests shall be transferred and delivered to Buyer free and clear of all security interests, pledges, liens and encumbrances, subject to the terms and conditions of the Operating Agreement.

3.2   Seller has all necessary power and authority to sell, transfer and deliver the Interests to Buyer and to enter into this Agreement and perform its obligations under this Agreement, subject to the terms and conditions of the Operating Agreement. Seller is the lawful record and beneficial owner of all of the Interests.

3.3   The execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, conflicts with, will result in a breach of, or constitutes a default under (upon the giving of notice or lapse of time or both) any agreement, contract, lease, license, instrument or other arrangement to which Seller is a party or by which Seller is bound or to which the Interests are subject other than the Operating Agreement

3.4   The execution, delivery and performance by the Seller of this Agreement will not conflict with or result in the breach of or constitute a default under any other agreement or instrument to which the Company is a part of which it or its property may be bound, or result in the creation of any lien thereunder

3.5   This Agreement has been duly authorized, executed and delivered by the Seller.

4.   Buyer's Representations.  Buyer represents and warrants to Seller that:

4.1   Buyer has all necessary power and authority to enter to acquire the Interests, pay the Purchase Price and enter into this Agreement and perform its obligations under this Agreement.

4.2   The execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, conflicts with, will result in a breach of, or constitutes a default under (upon the giving of notice or lapse of time or both) any agreement, contract, lease, license, instrument or other arrangement to which Buyer is a party or by which Buyer is bound.

4.3   This Agreement has been duly authorized, executed and delivered by the Seller.

5.   Acknowledgement of Operating Agreement.  Buyer and Seller agree and acknowledge that the sale, transfer and assignment of the Interests by Seller to Buyer is subject to the terms and conditions of the Company's Amended and Restated Operating Agreement (the "Operating Agreement"), including without limitation, the approval of the Company's members.

6.   Further Assurances.

6.1.   By Seller.  Seller will do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered all such further acts, conveyances and assurances the Buyer may reasonably require for accomplishment of the purposes of this Agreement.

6.2.   By Buyer.  The Buyer will do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered, all such further acts, conveyances and assurances as Seller may reasonably require for accomplishment of the purposes of this Agreement.

7.   Seller Release. Effective as of the date hereof, Seller and Aaron Blackman, does for himself, itself and their respective affiliates, heirs, beneficiaries, successors and assigns, if and y, releases and absolutely forever discharges Buyer and his affiliates and agents (each, a "released party") from and against all Released Matters. "Released Matters" means any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses (including attorneys' and accountants' fees and expenses), actions and causes of action of any nature whatsoever, whether based on common law or on any federal or state statute, rule, regulation, or other law or right of action, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, suspected or unsuspected, fixed or contingent, raised or not raised (regardless of whether such claim could be raised), and whether or not concealed or hidden, that Seller now has, or at any time previously had, or shall or may have in the future, acting as a member, officer, contractor, consultant or employee of the Company, arising by virtue of or in any matter related to any actions or inactions with respect to the Company or Buyer or its affairs with respect to the Company or Buyer on or before the date hereof.

8.   Miscellaneous.

8.1   The validity, construction, enforcement and effect of this Agreement shall be governed exclusively by the internal laws of the Commonwealth of Pennsylvania, without regard to its conflicts of laws provisions.

8.2   This Agreement may not be amended or modified except by a writing signed by both parties hereto.

8.3   The headings of the several sections in this Agreement are inserted for convenience only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

8.4   This Agreement constitutes the entire agreement, together with the Exhibits, of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements pertaining thereto.

8.5   This Agreement may be executed in one or more counterparts, including by signature pages delivered in electronic format, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.6   The terms of this Agreement shall be binding on, and inure to the benefit of, the parties hereto and their respective successors and assigns.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

Greg Hall

**SELLER:**

**Venture Quest Partners, LLC**

By: _____
Name:
Title:

EXHIBIT A

Form of Promissory Note

EXHIBIT B

Form of Pledge Agreement

EXHIBIT C

Amended and Restated
Exhibit A
to the
WageSecure Operating Agreement

| Members | Ownership Percentage |
|---|---|
| OPH | 41.25% |
| Greg Hall | 43.75% |
| Bob Deutsch | 2.0% |
| Dean O'Hare | 1.0% |
| Martin Becker | 2.0% |
| Venture Quest | 10.0% |

## SECURED PROMISSORY NOTE

$500,000.00

October 1, 2016

_____, Pennsylvania

FOR VALUE RECEIVED, the undersigned, Greg Hall, and his successors and assigns (the "Debtor"), promises to pay to the order of Venture Quest Partner, LLC and its successors and permitted assigns (the "Holder"), the principal sum of Five Hundred Thousand Dollars ($500,000.00) (the "Principal Sum"), together with interest from the date hereof on the balance of this note (this "Note"). Interest shall be at the rate set at five percent (5%). This Note is issued pursuant to the terms and conditions of that certain Membership Interest Purchase Agreement, dated as of the date hereof, by and among the Debtor and Holder ("Purchase Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement.

### Section 1. PAYMENT.

(a) Payment. The Obligor shall pay the holder fifteen thousand dollars ($15,000) in principal amount plus all accrued interest to date on the first day of each month commencing October 15, 2016 for the next twenty (20) consecutive months, and a final payment of all remaining outstanding principal of Three Hundred Fifty Thousand Dollars ($350,000.00) plus any remaining accrued and unpaid interest on September 15, 2017 (the "Maturity Date"). Any payment of the Principal Sum and Interest on any payment date shall be made payable to the Holder at the Holder's address set forth in Section 14.

(b) Payment on Non-Business Days. Whenever any payment to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the Commonwealth of Pennsylvania, such payment shall be due on the next succeeding business day.

### Section 2. DEFAULT RATE. Upon acceleration or maturity of this Note, Interest on the unpaid Principal Sum shall accrue at an annual rate of five (5%) percent above the interest rate then currently in effect or, if such rate of interest exceeds that which may be collected under applicable law, then at the maximum rate of interest, if any, which may be collected from the Debtor under applicable law. This interest rate shall survive the entry of any judgment relating to this Note. Notwithstanding the foregoing, the Default Rate shall not apply unless and until the Debtor receives notice from the Holder that a payment is late and the Debtor fails to cure such late payment within ten (10) days.

### Section 3. PREPAYMENTS. The Principal Sum of this Note may be prepaid, in whole or in part, without penalty and without the prior consent of the Holder at any time in writing to the Holder by the Debtor.

### Section 4. SECURITY. This Note is secured by the membership interests in WageSecure LLC being purchased by Debtor pursuant to the Purchase Agreement, subject to the terms and conditions of a Pledge Agreement to be executed simultaneously with this Note ("Pledge Agreement").

### Section 5. DEFAULT; REMEDIES.

(a) The Debtor shall be in default under this Note upon the happening of any condition or event set forth below (each, an "Event of Default"):

(i) the Debtor's failure to pay any payment of principal or interest after notice to the Debtor from the Holder of such late payment is due and the Debtor's failure to pay same within ten (10) days of such notice;

(ii) default by the Debtor in the punctual performance of any other material obligation, covenant, term or provision contained in this Note, and such default shall continue unremedied for a period of twenty (20) days or more following written notice of default by the Holder to the Debtor, provided, however, in the event such default cannot be cured within the said twenty (20) day period, the Debtor shall not be in default if it commences curing within the said twenty (20) day period and diligently pursues curing thereafter;

(iii) the Debtor's material breach of the Purchase Agreement, which breach shall remain uncured for a period of ten (10) days following written notice of such breach by the Holder, provided, however, in the event such default cannot be cured within the said twenty (20) day period, the Debtor shall not be in default if it commences curing within the said twenty (20) day period and diligently pursues curing thereafter; or

(iv) the Debtor's breach of any of the material terms and covenants contained in Pledge Agreement, which remains uncured after any applicable cure period.

(b) The entire unpaid Principal Sum and any accumulated and unpaid Interest of this Note shall immediately be due and payable at the option of the Holder upon the occurrence of any one or more of the Events of Default.

Section 6. **CUMULATIVE RIGHTS.** No delay on the part of the Holder in the exercise of any power or right under this Note or under any other instrument executed pursuant to this Note shall operate as a waiver of any such power or right, nor shall a single or partial exercise of any power or right preclude other or further exercise of such power or right or the exercise of any other power or right.

Section 7. **WAIVER.** The Debtor waives demand, presentment, protest, notice of dishonor, notice of nonpayment, notice of intention to accelerate or notice of acceleration other than notice of default pursuant to Section 5(a), notice of protest and any and all lack of diligence or delay in collection or the filing of suit on this Note which may occur, and agree to all extensions and partial payments, before or after maturity, without prejudice to the holder of this Note.

Section 8. **ATTORNEYS' FEES AND COSTS.** In the event that this Note is collected, in whole or in part, through suit, arbitration, mediation, or other legal proceeding of any nature, then and in any such case there shall be added to the unpaid principal amount of this Note all reasonable costs and expenses of collection, including, without limitation, reasonable attorney's fees.

Section 9. **GOVERNING LAW.** This Note shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to its conflicts of law provision.

Section 10. **HEADINGS.** The headings and captions used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note. All references in this Note to sections, paragraphs, exhibits, and schedules shall, unless otherwise provided, refer to sections and paragraphs of this Note and exhibits and schedules attached to this Note, all of which exhibits and schedules are incorporated in this Note by this reference.

**IN WITNESS WHEREOF,** the undersigned have executed this Note on and as of the date first above written.

Greg Hall

## PLEDGE AGREEMENT

This **Pledge Agreement** (this "Agreement") is made as of this 1st day of October, 2016, by and between Greg Hal ("Pledgor") and Venture Quest Partners, LLC (the "Pledgee").

**WHEREAS**, Pledgor and Pledgee have entered into a Membership Interest Purchase Agreement of even date herewith, in which Pledgee has agreed to sell part of its membership interests equal to 28.5% (the "Interest") in WageSecure LLC (the "Company") ("Purchase Agreement") to Pledgor; and

**WHEREAS**, in connection with the Purchase Agreement, Pledgor has entered into a Secured Promissory Note of even date herewith (the "Note") pursuant to which the Pledgor desires to pledge the Interests as collateral to secure the payment of Pledgor's obligations under the Note.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

1. <u>Pledge</u>.  Pledgor does, for himself, his heirs, executors, administrators and assigns, grant a security interest to Pledgee and pledge the Interest as security for the repayment of the Note; provided, however, that any Interests paid for by Pledgor in accordance with the Purchase Agreement and the Note shall no longer be considered pledged security Interests under this Agreement ("Acquired Interests").  However, in the Event of Default (as defined below), ten percent (10%) of the Acquired Interests shall be converted back into Interests, subject to the terms and conditions of this Agreement.  Pledgor appoints the Pledgee as his attorney-in-fact to arrange for the transfer of the Interests on the books of the Company in the Event of Default (as defined below), after any applicable cure period.

2. <u>Beneficial Ownership; Distributions</u>.  During the term of this Agreement, all distributions paid with respect to the Interests shall be applied to the unpaid principal balance on the Note; provided that Pledgor may receive such payments sufficient to pay income taxes payable by Pledgor, if any.  Pledgor shall be deemed to be the record and beneficial owner of the Interests for all other purposes.

3. <u>Voting Rights</u>.  So long as no Event of Default or event which, with the giving of notice or the lapse of time, or both, would become an Event of Default shall have occurred and be continuing, Pledgor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement or any of the Note; provided, however, that Pledgor shall, as a member, not exercise or refrain from exercising any such right if, in Pledgee's reasonable judgment, such action would have a material adverse effect on the value of the Interests or any part thereof, and, provided, further, that Pledgor shall give Pledgee at least three (3) business days' written notice of the manner in which Pledgor intends to exercise, or the reasons for refraining from exercising, any such right, if such voting or other consensual rights, if so exercised, may materially affect the value of the Interests.

4. <u>Adjustments</u>. In the event that, during the term of this Agreement, any reclassification, readjustment, or other change is declared or made in the capital structure of the Company, all new, substituted, and other additional securities, issued in respect of the Interests by reason of any such change shall be substituted therefor under this Agreement.

5. <u>Payment of Note</u>. Upon payment of all amounts owed to Pledgee under the Note or payment of the Acquired Interests, this Agreement shall terminate for all purposes and in all respects with to the Interests or Acquired Interests, respectively.

6. <u>Default</u>. The occurrence of any of the following events shall constitute an event of default ("Event of Default") (after any applicable cure period) (i) failure to make a payment obligation under the terms of the Note or (ii) breach under the terms of the Note.

7. <u>Remedies Upon an Event of Default</u>. (a) Pledgee may exercise, in respect of the Interests (other than with respect to the Acquired Interests), in addition the rights in the remaining Interests not paid for by Pledgor, and in addition to other rights and remedies provided for herein or otherwise available to Pledgee at law or in equity, all of the rights and remedies of a secured party on default under the Uniform Commercial Code in effect in the Commonwealth of Pennsylvania at that time (the "Code") (whether or not the Code applies to the affected Interests), and may also, without notice except as specified below, sell the remaining part of Interests or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Pledgee's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Pledgee may deem commercially reasonable. Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Pledgee shall not be obligated to make any sale of Interests regardless of notice of sale having been given. Pledgee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by Pledgee as Interests and all cash proceeds received by Pledgee in respect of any sale of, collection from, or other realization upon all received or any part of the Interests may, in the sole discretion of Pledgee, be held by Pledgee as collateral for, and/or then or at any time thereafter be applied (after payment of any amounts payable to Pledgee) in whole or in part by Pledgee against, all or any part of the amount due under Note in such order as Pledgee shall elect. Any surplus of such cash or cash proceeds held by Pledgee and remaining after payment in full of the remaining amount due under the Note shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

8. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles.

9. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

10. Invalidity. The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of the remaining provisions, which shall remain in full force and effect.

11. Notices. Any notice, election, demand, request or other document or communication required or permitted under this Agreement shall be in writing and shall be deemed sufficiently given only if delivered in person or sent by certified or registered mail, postage prepaid, return receipt requested, addressed to Pledgee or Pledgor, as the case may be, as follows:

If to Pledgor:

If to Pledgee:

12. Amendments, Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in writing and signed by Pledgee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13. Headings. The headings used herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

14. Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

15. Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

[Remainder of Page Intentionally Left Blank]

-3-

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first written above.

**PLEDGEE**
Venture Quest Partners, LLC


By: _____
Name:
Title:


**PLEDGOR**

_____
Greg Hal

-4-

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This **Membership Interest Purchase Agreement** (this "Agreement") is made as of the 15th day of October, 2016 by and between OPH, LLC ("Buyer") and Venture Quest Partners, LLC ("Seller").

### RECITALS:

**WHEREAS,** Seller is the owner of 72.5% of the membership interests ("Interests") in WageSecure, LLC, a Delaware limited liability company (the "Company"); and

**WHEREAS,** Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, 28.5% of the Interests in the Company upon the terms and conditions provided herein.

**NOW, THEREFORE,** the parties hereto agree as follows:

1.  Purchase and Sale.

1.1   Pursuant to the terms and conditions of this Agreement, Seller hereby agrees to sell and transfer to Buyer and Buyer hereby agrees to purchase from Seller, thirty percent (30%) of the Interests in the Company. The new equity ownership for the Company is set forth on Exhibit C as the Amended and Restated Exhibit A to the Operating Agreement.

1.2   The total purchase price for the Interests to be paid by the Buyer to the Seller shall be five hundred thousand dollars ($500,000) ($50,000 per 3% percent of the Interests) (the "Purchase Price").   For each 3% of the Company paid for by Buyer ("Acquired Interests"), such Acquired Interests will no longer subject to the Pledge Agreement (as defined below), except as otherwise set forth therein.

1.3   The Purchase Price shall be paid by delivery of a promissory note (the "Note") from the Buyer in the form of Exhibit A attached hereto, in the total principal amount of the Purchase Price, payable in regular monthly payments of principal and interest, commencing on November 1, 2016 with a balloon payment of the amount then remaining payable on September 1, 2017, which will be secured by the Interests, other than the Acquired Interests, pursuant to a pledge agreement (the "Pledge Agreement"), in the form of which is attached hereto as Exhibit B.

2.   Seller's Representations.  Seller represents and warrants to Buyer that:

3.1   Subject to the terms and conditions of the Operating Agreement (as defined in Section 5 below), Seller owns good and marketable title to the Interests, free and clear of all security interests, pledges, liens and encumbrances.   The Interests shall be transferred and delivered to Buyer free and clear of all security interests, pledges, liens and encumbrances, subject to the terms and conditions of the Operating Agreement.

3.2   Seller has all necessary power and authority to sell, transfer and deliver the Interests to Buyer and to enter into this Agreement and perform its obligations under this Agreement, subject to the terms and conditions of the Operating Agreement. Seller is the lawful record and beneficial owner of all of the Interests.

3.3   The execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, conflicts with, will result in a breach of, or constitutes a default under (upon the giving of notice or lapse of time or both) any agreement, contract, lease, license, instrument or other arrangement to which Seller is a party or by which Seller is bound or to which the Interests are subject other than the Operating Agreement

3.4   The execution, delivery and performance by the Seller of this Agreement will not conflict with or result in the breach of or constitute a default under any other agreement or instrument to which the Company is a part of which it or its property may be bound, or result in the creation of any lien thereunder

3.5   This Agreement has been duly authorized, executed and delivered by the Seller.

4.   <u>Buyer's Representations</u>. Buyer represents and warrants to Seller that:

4.1   Buyer has all necessary power and authority to enter to acquire the Interests, pay the Purchase Price and enter into this Agreement and perform its obligations under this Agreement.

4.2   The execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, conflicts with, will result in a breach of, or constitutes a default under (upon the giving of notice or lapse of time or both) any agreement, contract, lease, license, instrument or other arrangement to which Buyer is a party or by which Buyer is bound.

4.3   This Agreement has been duly authorized, executed and delivered by the Seller.

5.   <u>Acknowledgement of Operating Agreement</u>. Buyer and Seller agree and acknowledge that the sale, transfer and assignment of the Interests by Seller to Buyer is subject to the terms and conditions of the Company's Amended and Restated Operating Agreement (the "Operating Agreement"), including without limitation, the approval of the Company's members.

6.   <u>Further Assurances</u>.

6.1.   <u>By Seller</u>. Seller will do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered all such further acts, conveyances and assurances the Buyer may reasonably require for accomplishment of the purposes of this Agreement.

6.2.   <u>By Buyer</u>. The Buyer will do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered, all such further acts, conveyances and assurances as Seller may reasonably require for accomplishment of the purposes of this Agreement.

-2-

7.    <u>Seller Release</u>.  Effective as of the date hereof, Seller and Aaron Blackman, does for himself, itself and their respective affiliates, heirs, beneficiaries, successors and assigns, if and y, releases and absolutely forever discharges Buyer and his affiliates and agents (each, a "released party") from and against all Released Matters. "Released Matters" means any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses (including attorneys' and accountants' fees and expenses), actions and causes of action of any nature whatsoever, whether based on common law or on any federal or state statute, rule, regulation, or other law or right of action, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, suspected or unsuspected, fixed or contingent, raised or not raised (regardless of whether such claim could be raised), and whether or not concealed or hidden, that Seller now has, or at any time previously had, or shall or may have in the future, acting as a member, officer, contractor, consultant or employee of the Company, arising by virtue of or in any matter related to any actions or inactions with respect to the Company or Buyer or its affairs with respect to the Company or Buyer on or before the date hereof.

8.    <u>Miscellaneous.</u>

8.1    The validity, construction, enforcement and effect of this Agreement shall be governed exclusively by the internal laws of the Commonwealth of Pennsylvania, without regard to its conflicts of laws provisions.

8.2    This Agreement may not be amended or modified except by a writing signed by both parties hereto.

8.3    The headings of the several sections in this Agreement are inserted for convenience only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

8.4    This Agreement constitutes the entire agreement, together with the Exhibits, of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements pertaining thereto.

8.5    This Agreement may be executed in one or more counterparts, including by signature pages delivered in electronic format, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.6    The terms of this Agreement shall be binding on, and inure to the benefit of, the parties hereto and their respective successors and assigns.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER:**
**OPH, LLC**

By: _____
Name: Robert Hill
Title: CEO

**SELLER:**

**Venture Quest Partners, LLC**

By: _____
Name:
Title:

EXHIBIT A

Form of Promissory Note

EXHIBIT B

Form of Pledge Agreement

EXHIBIT C

Amended and Restated
Exhibit A
to the
WageSecure Operating Agreement

| Members | Ownership Percentage |
|---|---|
| OPH | 41.25% |
| Greg Hall | 43.75% |
| Bob Deutsch | 2.0% |
| Dean O'Hare | 1.0% |
| Martin Becker | 2.0% |
| Venture Quest | 10.0% |

-4-

**SECURED PROMISSORY NOTE**

$500,000.00              October 15, 2016
                      ~~Hmghay~~, Pennsylvania

  **FOR VALUE RECEIVED**, the undersigned, **OPH, LLC**, and its successors and assigns (the "Debtor"), promises to pay to the order of **Venture Quest Partner, LLC** and its successors and permitted assigns (the "Holder"), the principal sum of Five Hundred Thousand Dollars ($500,000.00) (the "Principal Sum"), together with interest from the date hereof on the balance of this note (this "Note"). Interest shall be at the rate set five percent (5%). This Note is issued pursuant to the terms and conditions of that certain Membership Interest Purchase Agreement, dated as of the date hereof, by and among the Debtor and Holder ("Purchase Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement.

  Section 1. **PAYMENT.**

   (a) Payment. The Obligor shall pay the holder fifteen thousand dollars ($15,000) in principal amount plus all accrued interest to date on the first day of each month commencing November 1, 2016 for the next twenty (20) consecutive months, and a final payment of all remaining outstanding principal of Three Hundred Fifty Thousand Dollars ($350,000.00) plus any remaining accrued and unpaid interest on September 1, 2017 (the "Maturity Date"). Any payment of the Principal Sum and Interest on any payment date shall be made payable to the Holder at the Holder's address set forth in Section 14.

   (b) Payment on Non-Business Days. Whenever any payment to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the Commonwealth of Pennsylvania, such payment shall be due on the next succeeding business day.

   Section 2. **DEFAULT RATE.** Upon acceleration or maturity of this Note, Interest on the unpaid Principal Sum shall accrue at an annual rate of five (5%) percent above the interest rate then currently in effect or, if such rate of interest exceeds that which may be collected under applicable law, then at the maximum rate of interest, if any, which may be collected from the Debtor under applicable law. This interest rate shall survive the entry of any judgment relating to this Note. Notwithstanding the foregoing, the Default Rate shall not apply unless and until the Debtor receives notice from the Holder that a payment is late and the Debtor fails to cure such late payment within ten (10) days.

   Section 3. **PREPAYMENTS.** The Principal Sum of this Note may be prepaid, in whole or in part, without penalty and without the prior consent of the Holder at any time in writing to the Holder by the Debtor.

   Section 4. **SECURITY.** This Note is secured by the membership interests in WageSecure LLC being purchased by Debtor pursuant to the Purchase Agreement, subject to the terms and conditions of a Pledge Agreement to be executed simultaneously with this Note ("Pledge Agreement").

  Section 5. **DEFAULT; REMEDIES.**

   (a) The Debtor shall be in default under this Note upon the happening of any condition or event set forth below (each, an "Event of Default"):

(i) the Debtor's failure to pay any payment of principal or interest after notice to the Debtor from the Holder of such late payment is due and the Debtor's failure to pay same within ten (10) days of such notice;

(ii) default by the Debtor in the punctual performance of any other material obligation, covenant, term or provision contained in this Note, and such default shall continue unremedied for a period of twenty (20) days or more following written notice of default by the Holder to the Debtor, provided, however, in the event such default cannot be cured within the said twenty (20) day period, the Debtor shall not be in default if it commences curing within the said twenty (20) day period and diligently pursues curing thereafter;

(iii) the Debtor's material breach of the Purchase Agreement, which breach shall remain uncured for a period of ten (10) days following written notice of such breach by the Holder, provided, however, in the event such default cannot be cured within the said twenty (20) day period, the Debtor shall not be in default if it commences curing within the said twenty (20) day period and diligently pursues curing thereafter; or

(iv) the Debtor's breach of any of the material terms and covenants contained in Pledge Agreement, which remains uncured after any applicable cure period.

(b) The entire unpaid Principal Sum and any accumulated and unpaid Interest of this Note shall immediately be due and payable at the option of the Holder upon the occurrence of any one or more of the Events of Default.

Section 6. **CUMULATIVE RIGHTS.** No delay on the part of the Holder in the exercise of any power or right under this Note or under any other instrument executed pursuant to this Note shall operate as a waiver of any such power or right, nor shall a single or partial exercise of any power or right preclude other or further exercise of such power or right or the exercise of any other power or right.

Section 7. **WAIVER.** The Debtor waives demand, presentment, protest, notice of dishonor, notice of nonpayment, notice of intention to accelerate or notice of acceleration other than notice of default pursuant to Section 5(a), notice of protest and any and all lack of diligence or delay in collection or the filing of suit on this Note which may occur, and agree to all extensions and partial payments, before or after maturity, without prejudice to the holder of this Note.

Section 8. **ATTORNEYS' FEES AND COSTS.** In the event that this Note is collected, in whole or in part, through suit, arbitration, mediation, or other legal proceeding of any nature, then and in any such case there shall be added to the unpaid principal amount of this Note all reasonable costs and expenses of collection, including, without limitation, reasonable attorney's fees.

Section 9. **GOVERNING LAW.** This Note shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to its conflicts of law provision.

Section 10. **HEADINGS.** The headings and captions used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note. All references in this Note to sections, paragraphs, exhibits, and schedules shall, unless otherwise provided, refer to sections and paragraphs of this Note and exhibits and schedules attached to this Note, all of which exhibits and schedules are incorporated in this Note by this reference.

Section 11. **USURY.** All agreements between the Debtor and the Holder are expressly limited so that in no contingency or event whatsoever, whether by acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid, to the Holder for the use, forbearance or detention of the money to be loaned under this Note or otherwise, exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provision of this Note at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then the obligation to be fulfilled shall be reduced to the limit of such validity.

Section 12. **SUCCESSORS AND ASSIGNS.** This Note may not be sold, transferred or otherwise assigned by the Holder without the prior written consent of the Debtor. All of the stipulations, promises and agreements in this Note made by or on behalf of the Debtor shall bind the successors and assigns of the Debtor, whether so expressed or not, and inure to the benefit of the successors and permitted assigns of the Holder.

Section 13. **SEVERABILITY.** If one or more provisions of this Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

Section 14. **NOTICES.** All notices, requests, consents, and other communications under this Note shall be in writing and shall be delivered personally or by facsimile transmission or by nationally recognized overnight delivery service or by first class certified or registered mail, return receipt requested, postage prepaid:

If to the Debtor, at .

If to the Holder, at .

or at such other address or addresses as may have been furnished by giving five (5) business days advance written notice to all other parties. Notices provided in accordance with this Section shall be deemed delivered upon personal delivery (including confirmed facsimile, provided the notice was also sent by certified and regular mail) or three (3) business days after deposit in the mail.

Section 15. **REPLACEMENT.** Upon receipt of a duly executed, notarized and unsecured written statement from the Holder with respect to the loss, theft or destruction of this Note (or any replacement hereof), and without requiring an indemnity bond or other security, or, in the case of a mutilation of this Note, upon surrender and cancellation of such Note, the Debtor shall issue a new Note, of like tenor and amount, in lieu of such lost, stolen, destroyed or mutilated Note.

Section 16. **AMENDMENTS.** This Note may not be modified or amended in any manner except in writing executed by the Debtor and the Holder.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the undersigned have executed this Note on and as of the date first above written.

OPH, LLC

By:

Name: Robert Hill

Title: CEO

## PLEDGE AGREEMENT

This **Pledge Agreement** (this "Agreement") is made as of this 15th day of October, 2016, by and between OPH, LLC ("Pledgor") and Venture Quest Partners, LLC (the "Pledgee").

**WHEREAS**, Pledgor and Pledgee have entered into a Membership Interest Purchase Agreement of even date herewith, in which Pledgee has agreed to sell part of its membership interests equal to 28.5% (the "Interest") in WageSecure LLC (the "Company") ("Purchase Agreement") to Pledgor; and

**WHEREAS**, in connection with the Purchase Agreement, Pledgor has entered into a Secured Promissory Note of even date herewith (the "Note") pursuant to which the Pledgor desires to pledge the Interests as collateral to secure the payment of Pledgor's obligations under the Note.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

1. <u>Pledge</u>.  Pledgor does, for itself, its heirs, executors, administrators and assigns, grant a security interest to Pledgee and pledge the Interest as security for the repayment of the Note; provided, however, that any Interests paid for by Pledgor in accordance with the Purchase Agreement and the Note shall no longer be considered pledged security Interests under this Agreement ("Acquired Interests").  However, in the Event of Default (as defined below), ten percent (10%) of the Acquired Interests shall be converted back into Interests, subject to the terms and conditions of this Agreement.  Pledgor appoints the Pledgee as his attorney-in-fact to arrange for the transfer of the Interests on the books of the Company in the Event of Default (as defined below), after any applicable cure period.

2. <u>Beneficial Ownership; Distributions</u>.  During the term of this Agreement, all distributions paid with respect to the Interests shall be applied to the unpaid principal balance on the Note; provided that Pledgor may receive such payments sufficient to pay income taxes payable by Pledgor, if any.  Pledgor shall be deemed to be the record and beneficial owner of the Interests for all other purposes.

3. <u>Voting Rights</u>.  So long as no Event of Default or event which, with the giving of notice or the lapse of time, or both, would become an Event of Default shall have occurred and be continuing, Pledgor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement or any of the Note; provided, however, that Pledgor shall, as a member, not exercise or refrain from exercising any such right if, in Pledgee's reasonable judgment, such action would have a material adverse effect on the value of the Interests or any part thereof, and, provided, further, that Pledgor shall give Pledgee at least three (3) business days' written notice of the manner in which Pledgor intends to exercise, or the reasons for refraining from exercising, any such right, if such voting or other consensual rights, if so exercised, may materially affect the value of the Interests.

4. Adjustments. In the event that, during the term of this Agreement, any reclassification, readjustment, or other change is declared or made in the capital structure of the Company, all new, substituted, and other additional securities, issued in respect of the Interests by reason of any such change shall be substituted therefor under this Agreement.

5. Payment of Note. Upon payment of all amounts owed to Pledgee under the Note or payment of the Acquired Interests, this Agreement shall terminate for all purposes and in all respects with to the Interests or Acquired Interests, respectively.

6. Default. The occurrence of any of the following events shall constitute an event of default ("Event of Default") (after any applicable cure period) (i) failure to make a payment obligation under the terms of the Note or (ii) breach under the terms of the Note.

7. Remedies Upon an Event of Default. (a) Pledgee may exercise, in respect of the Interests (other than with respect to the Acquired Interests), in addition the rights in the remaining Interests not paid for by Pledgor, and in addition to other rights and remedies provided for herein or otherwise available to Pledgee at law or in equity, all of the rights and remedies of a secured party on default under the Uniform Commercial Code in effect in the Commonwealth of Pennsylvania at that time (the "Code") (whether or not the Code applies to the affected Interests), and may also, without notice except as specified below, sell the remaining part of Interests or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Pledgee's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Pledgee may deem commercially reasonable. Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Pledgee shall not be obligated to make any sale of Interests regardless of notice of sale having been given. Pledgee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by Pledgee as Interests and all cash proceeds received by Pledgee in respect of any sale of, collection from, or other realization upon all received or any part of the Interests may, in the sole discretion of Pledgee, be held by Pledgee as collateral for, and/or then or at any time thereafter be applied (after payment of any amounts payable to Pledgee) in whole or in part by Pledgee against, all or any part of the amount due under Note in such order as Pledgee shall elect. Any surplus of such cash or cash proceeds held by Pledgee and remaining after payment in full of the remaining amount due under the Note shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

8. Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles.

9. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

-2-

10. Invalidity.  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of the remaining provisions, which shall remain in full force and effect.

11. Notices.  Any notice, election, demand, request or other document or communication required or permitted under this Agreement shall be in writing and shall be deemed sufficiently given only if delivered in person or sent by certified or registered mail, postage prepaid, return receipt requested, addressed to Pledgee or Pledgor, as the case may be, as follows:

If to Pledgor:

If to Pledgee:

12. Amendments, Etc.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in writing and signed by Pledgee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13. Headings.  The headings used herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

14. Entire Agreement.  This Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

15. Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first written above.

**PLEDGEE**
Venture Quest Partners, LLC

By: _____

Name:

Title:


**PLEDGOR**
OPH, LLC

By : _____

Name: Robert Hill

Title: CEO