IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT HILL, GREGORY HALL And ONE PARTICULAR HARBOR, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>ZAMBRIO & ASSOCIATES, LLC And LOUIS ZAMBRIO,<br><br>Defendants. | Civil Action No.:2:19-CV-1009-ES-CLW<br><br>Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Partial Dismissal |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL

ZARWIN ◆ BAUM ◆ DEVITO
KAPLAN ◆ SCHAER ◆ TODDY ◆ P.C.
*Attorneys for Plaintiffs*

By: */s/ Brendan G. Lamanna*
BRENDAN G. LAMANNA, ESQ.
ANTHONY R. TWARDOWSKI, ESQ. (*pro hac vice*)
bglamanna@zarwin.com
artwardowski@zarwin.com
1818 Market Street, 13th Floor
Philadelphia, PA 19103
Ph: (215) 569-2800
Fax: (215) 569-1606
Attorney for Plaintiffs

**Motion Filed: April 2, 2019**
**Opposition Filed: April 22, 2019**
**Motion Date: May 6, 2019**

**TABLE OF CONTENTS**

I. **INTRODUCTION**……………………………………………………………….1

II. **PERTINENT UNCONTESTED FACTS**……………………………………2

III. **LEGAL ARGUMENT**……………………………………………………..7

    a. **Standard**…………………………………………………………………...7

    b. **Hill Has Standing and is a Proper Plaintiff in this Action**…………………….7

IV. **CONCLUSION**…………………………………………………………..9

## **TABLE OF AUTHORITIES**

**Cases**

*Bell Atlantic Corp. v. Twombly,*
    *550 U.S. 544, 555-556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*……………………….…7

*Lujan v. Defenders of Wildfire*,
    504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992)…………………………………………7, 8

*Warren Gen. Hosp. v. Amgen Inc.,*
    643 F.3d 77, 84(3d Cir. 2011)……………………………………………………………….7

*Blunt v. Lower Merion Sch. Dist.*,
    767 F.3d 247, 278 (3d Cir. 2014)……………………………………………………………8

*New Jersey Physicians, Inc. v. President of the United States,*
    653 F.3d 234, 238 (3d Cir. 2011)……………………………………………………………8

*Danvers Motor Co. v. Ford Motor Co.*,
    432 F.3d 286, 291, 294 (3d Cir. 2005)………………………………………..………...8

*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir. 1997)…………………...…7

*Zinn v. Seruga*,
    2006 U.S. Dist. LEXIS 51773 (D.N.N. July 28, 2006)…………………………………....9

## I. INTRODUCTION

Plaintiffs, Robert Hill ("Hill"), Gregory Hall ("Hall") and One Particular Harbor, LLC ("OHP") (collectively, "Plaintiffs"), commenced this action against their former attorney, Defendant, Louis Zambrio ("Zambrio"), and his law firm, Defendant, Zambrio & Associates ("Z&A") (collectively, "Defendants"), to recover damages sustained as a direct result of Zambrio's failure to follow express instructions given to him by Hill and Hall in connection with the negotiation and preparation of certain transactional documents. For the reasons set forth herein, Defendants' Motion to Dismiss ("Motion") the claims asserted by Hill should be denied as Hill has standing because he suffered direct damages which are independent of the damages suffered by OPH

As noted, this case arises out of Defendants' representation of Plaintiffs in connection with a transaction whereby Hill (through OPH) and Hall agreed to acquire additional membership interests in WageSecure, LLC ("WageSecure") from its then majority owner, Venture Quest Partners, LLC ("VQ"), which in turn was owned and controlled by Aaron Blackman ("Blackman"). Under the Agreement, Hill (through OPH) and Hall were to purchase all but 15% of VQ's membership interests by making monthly payments of $15,000 plus interest with a balloon payment of $850,000 due in September 2017. For each $50,000 paid, Hill (through OPH) and Hall each were to acquire additional interests in WageSecure. Significantly, under the agreement, Hill (through OPH) and Hall were to have the right to stop making monthly payments at any time, in which case they would retain the membership interests already acquired, less a ten percent (10%) penalty ("10% Penalty"), and VQ would retain the rest. The right to stop making payment at any time subject only to the 10% Penalty was of paramount

1

importance to Hill and Hall. Indeed, on multiple occasions prior to executing the Notes, Pledges and Membership Interest Purchase Agreement ("MIPA") ("Transaction Documents") memorializing the transaction, Hill and Hall expressly communicated this in writing to Zambrio. Notwithstanding the express instructions given to him, and as Hill and Hall later came to learn, Zambrio failed to draft the documents such that Hill (through) and Hall could stop making payments at any time subject only to the 10% Penalty.

In April of 2017, Hill and Hall, believing they were entitled to do so, stopped making payments pursuant to the Transaction Documents. Shortly thereafter, Blackman and VQ declared a default under the Transaction Documents. After conferring with counsel, Hill and Hall learned that, despite the express instructions given by them to Zambrio, the Transaction Documents did not allow them to stop making payment at any time subject only to the 10% Penalty. Lawsuits ensued. Hill, in his individual capacity, was a party to the lawsuits. As a result, Hill incurred fees and costs, including a portion of the settlement payment that was made to settle the underlying lawsuits. In the instant lawsuit, Hill seeks as damages recovery of, among other things, the fees and costs in connection with the underlying lawsuits. These damages are separate and distinct form the damages claimed by OPH. Accordingly, because Hill has damages which are separate and distinct from those claimed by OPH, Hill has standing and, therefore, Defendants' Motion should be denied.

## II.  PERTINENT UNCONTESTED FACTS

In August 2014, Hill (initially individually and later through OPH) and Hall invested in WageSecure. *See* Plaintiffs' Complaint, Doc. 1, ¶ 10. For a variety of reasons which are immaterial to the Motion, the relationship between Hill and Hall, on the one hand, and

2

Blackman, on the other hand, soured significantly over the course of the next two years. *Id.* at ¶ 14 & 20.

In September of 2016, Hill and Hall began discussions with Blackman whereby Blackman (through VQ) would relinquish to Hill and Hall all but a small percentage of his equity interest in WageSecure. *Id.* at ¶ 20.

On September 26, 2016, Hill emailed Zambrio setting forth the salient terms of the agreement Hill and Hall intended to reach with Blackman. *Id.* at ¶ 21. After outlining the financial terms, Hill noted "[i]f we stop payment or fail to pay the remaining we keep the % we paid for less 10% as a penalty for not completing the contract." *Id.* at ¶ 21. Hill went on to provide an example and at the conclusion of the email wrote "[w]e want to be able to walk away at any time." *Id.* at ¶ 21.

An agreement ultimately was reached in October 2016, pursuant to which Hill (through OPH) and Hall, collectively, would pay to VQ $15,000 per month plus accrued interest, beginning on November 1, 2016. *Id.* at ¶ 22. For each $50,000 paid toward the $1,000,000 total purchase price, Hill (through OPH) and Hall each were to acquire additional interests in WageSecure. *Id.* at ¶ 23. In the event Hill (through OPH) and Hall decided to acquire the maximum interests, a balloon payment of $850,000, plus interest, was due on September 1, 2017. *Id.* at ¶ 24. Upon payment of the full purchase price, the parties agreed that VQ's interest in WageSecure would be reduced to fifteen percent (15%). *Id.* at ¶ 25.

Hill and Hall hired Defendants to prepare written instruments documenting the proposed transaction. *Id.* at ¶ 26. Hill and Hall understood and intended, and so communicated to Zambrio and Z&A, that they could at any time stop their monthly payments to VQ and forego the acquisition of further membership interests, in which case Hill (through OPH) and Hall

would retain the membership interests already acquired, less the 10% Penalty, and VQ would retain the rest. *Id.* at ¶ 27.

On October 5, 2016 at approximately 8:32a.m., Zambrio circulated by email drafts of the Transaction Documents to Hill and Hall. *Id.* at ¶ 28.

Approximately one hour later, at 9:20a.m., Hill emailed Zambrio, stating, in relevant part: "[a]s long as we can exit with just a proportional part of the shares (less 10% penalty) this works." *Id.* at ¶ 29.

Approximately one hour after that, at 10:40a.m., Zambrio wrote to Hill and Hall, in relevant part, as follows:

> The documents read that you keep the interests you pay for ("Acquired Interests") less the 10% penalty, however failure to pay will be a default where he can take the remaining interests back and do what he wants with them. His attorney will probably not allow it to go any other way. Let me know you get that from the Pledge Agreement and Purchase Agreement.

*Id.* at ¶ 30.

Hill responded at 11:22 as follows:

> What we want to have happen is:
>
> 1M payment for 60%
> If we only pay 100k we get 6% less 10% for the default or 5.4% net
> He gets 54.6.% back
> Nothing in regards to the shares we already own.

*Id.* at ¶ 31. Hall weighed-in a few minutes later, stating "[p]lease do it." *Id.* at ¶ 32.

Later that afternoon, Zambrio circulated to Hill and Hall a revised MIPA, Pledge Agreement and Promissory Note, which Hall thereafter emailed to Blackman and his counsel. *Id.* at ¶ 33.

Hill and Hall executed and returned to Zambrio the Transaction Documents on or about October 7, 2016.[1]  *Id.* at ¶ 34.

As Hill and Hall later came to learn, the Transactoin Documents contained multiple errors and omissions, including but not limited to the following:

- The documents incorrectly stated the respective interests of the members as of the time of the October transaction;
- The Recitals in the MIPAs suggested that Hill (through OPH) and Hall were acquiring 28.5% each, while Section 1.1 indicated that they were acquiring 30% each;
- The Notes suggested that installment payments would begin on October 15, 2017 and continue for the next twenty months, yet the maturity date and balloon payment due date under the Notes was only eleven months out (September 15, 2017).

*Id.* at ¶ 35.  Most significantly, the Transaction Documents did not allow Hill (through OPH) and Hall to stop making payment at any time, subject only to the 10% Penalty.  *Id.* at ¶ 36.

From November 1, 2016 through April 1, 2017, Hill (through OPH) and Hall collectively paid to VQ a total $90,000 (i.e. $15,000/month x six months).  *Id.* at ¶ 37.

In April 2017, Hill and Hall learned that Blackman was engaged in an array of misconduct detrimental to WageSecure and its members.  *Id.* at ¶ 38.   Hill and Hall instructed Blackman to refrain from continued misconduct but Blackman refused.  *Id.* at ¶ 39.  As Blackman's refusal to cease his misconduct directly affected Hill's (through OPH) and Hall's membership interests in WageSecure, and in particular the additional membership interests they

---

[1] VQ, Hill, Hall and Blackman also entered into a Loan Termination Agreement pursuant to which the Hill/Hall Notes were cancelled.

were acquiring pursuant to the Transaction Documents, Hill (through OPH) and Hall, believing that they were entitled to do so, ceased making payments on their Notes. *Id.* at ¶ 40. Hill and Hall further advised Blackman and VQ that they (Hill and Hall) would take appropriate legal action to protect their and WageSecure's interests and secure compensation for all resulting losses. *Id.* at ¶ 41.

Thereafter, Blackman and VQ took the offensive and declared the Notes and Pledges in default and demanded that Hill and Hall each repay the full balance of their respective Notes. *Id.* at ¶ 42. After conferring with counsel, Hill and Hall for the first time learned that the October 2016 Documents conferred upon VQ not only the reversionary right to receive the unacquired interests plus the 10% Penalty in the event of non-payment, but to hold Hill (through OPH) and Hall liable for the unpaid balance of their Notes as well. *Id.* at ¶ 43. In other words, Hill and Hall learned that the October 2016 Documents did not provide for, as Hill and Hall expressly instructed Zambrio, the right to stop payment at any time, subject only to the 10% Penalty. *Id.* at ¶ 44.

After several months of hotly contested litigation in both New York and Pennsylvania, in which Hill (through OPH) and Hall sought to have the MIPA, Notes and Pledges reformed or, in the alternative, declared null and void, Hill and Hall settled their disputes with Blackman. *Id.* at ¶ 45. Pursuant to the terms of the settlement agreement with Blackman, Hill and Hall agreed to pay Blackman $850,000 and Blackman (through VQ) would retain a 22.5% interest in WageSecure. *Id.* at ¶ 46. Hill, Hall and Blackman further agreed to work together to sell WageSecure and, upon its sale, Blackman was to receive the first $350,000 of the sale proceeds which Hill and Hall would otherwise be entitled to, with the remaining sale proceeds to be distributed on a pro-rata basis based upon respective membership interests. *Id.* at ¶ 47. Hill,

Hall and Blackman have since entered into additional agreements, which have served to, *inter alia*, adjust the amounts payable to Blackman (through VQ) at and following the sale of WageSecure. *Id.* at ¶ 48.

### III. LEGAL ARGUMENT

#### a. Standard

In deciding a motion to dismiss, the court must accept all well pleaded allegations in the complaint as true and must view those allegations in the light most favorable to the plaintiff. *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 84(3d Cir. 2011) (*citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. A motion to dismiss may only be granted if, having accepted all well pleaded allegations as true and viewing them in the light most favorable to plaintiff, the law provides that plaintiff is not entitled to relief. *Id.* The question is not whether a plaintiff will ultimately prevail on its claims, but whether the plaintiff is entitled to offer evidence to support its claims. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir. 1997).

#### b. Hill Has Standing and is a Proper Plaintiff in this Action

As a preliminary matter, Defendants merely contend that Hill "lacks standing to assert a malpractice claim against Zambrio…" *See generally* Defendants' Motion, Section III, Argument. Defendants do not argue that Hill does not have standing to assert claims for breach of contract and breach of fiduciary duty. Accordingly, even if Hill does not have standing to assert a claim for malpractice, which he does for the reasons set forth herein, Hill's claims for breach of contract and breach of fiduciary duty should not be dismissed.

With regard to the issue of standing, the Supreme Court has articulated the elements for standing as follows: "1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; 2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and 3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildfire*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992). "An injury is 'concrete' if it is real, or distinct and palpable, as opposed to merely abstract, and is sufficiently particularized if 'it affects the plaintiff in a personal and individual way.'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (quoting *New Jersey Physicians, Inc. v. President of the United States,* 653 F.3d 234, 238 (3d Cir. 2011).

Furthermore, in the context of a motion to dismiss, the Third Circuit has observed "[i]njury-in-fact is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege some specific, identifiable trifle of injury." *Blunt*, 767 F.3d at 278 (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 294 (3d Cir. 2005). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137 (internal citations omitted).

In their rather limited analysis,[2] Defendants simply claim that Hill does not have standing because "[Hill] has not, and cannot, set forth any injury independent of OPH's alleged harm arising from the WageSecure transaction." *See* Defendants' Motion, pp. 6-7. That is simply not

---

[2] Defendants do not argue that no attorney-client relationship existed between Hill and Defendants. Nor do Defendants argue that they did not owe a duty to Hill. *See* Defendants' Motion, Section III, Argument, pp. 3-7.

8

the case. Hill has sustained direct, individual harms. First, Hill was a party to the underlying lawsuits, which were borne out of Defendants' failure to properly draft the Transaction Documents such that Defendants could stop making payment at any time, subject only to the 10% Penalty. As a result of being a party to the underlying lawsuits, Hill incurred legal fees and costs, including a portion of the payment made to settle the underlying matters. Those costs and expenses, which are part of the damages claimed herein, are direct, individual harms independent of the damages claimed and sustained by OPH. *See* Plaintiffs' Complaint, ¶ 49. *Zinn v. Seruga*, 2006 U.S. Dist. LEXIS 51773 (D.N.N. July 28, 2006) (concluding that individual plaintiff, the sole shareholder of a corporate plaintiff, had standing where he alleged, *inter alia*, to have suffered monetary damages distinct from those suffered by the corporate plaintiff). Because Hill suffered direct, individual damages, he has standing.

### IV. CONCLUSION

For the reasons set forth herein, Hill has standing and, therefore, Defendants' Motion should be denied.

> **ZARWIN ◆ BAUM ◆ DEVITO**
> **KAPLAN ◆ SCHAER ◆ TODDY ◆ P.C.**
> *Attorneys for Plaintiffs*
>
>     */s/*
> BRENDAN G. LAMANNA, ESQ.
> bglamanna@zarwin.com
> 1818 Market Street, 13th Floor
> Philadelphia, PA 19103
> Ph: (215) 569-2800
> Fax: (215) 569-1606
> Attorney for Plaintiffs

Date:  4.22.19